# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DAMIAN ALVARADO,

    Plaintiffs,
                                    Case No.

v.
                                              Hon.

MADISON SCHOOL DISTRICT;
MATTHEW GARNO, an individual;
LORI ROBINETTE, an individual;
MICHAEL WEISSEND, an individual;
EDUSTAFF, LLC, a Michigan Limited
Liability Company;

    Defendants.
_____/

MICHAEL W. LAURILA (P86937)
CHRISTENSEN LAW
Attorneys for Plaintiff
25925 Telegraph Rd., Suite 200
Southfield, MI  48033
(248) 213-4900 | (248) 213-4901 – Fax
mlaurila@davidchristensenlaw.com
tcalmese@davidchristensenlaw.com
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Damian Alvarado, by and through his attorneys, CHRISTENSEN

LAW, states the following for his Complaint against the above-named Defendants:

### INTRODUCTION

1.     This action arises from serious personal injuries suffered by Damian Alvarado while he was participating in a junior varsity football game on August 30, 2023 and sustained a brain bleed following a series of hits to the head.

2.     At the time of this incident Damian Alvarado was under the age of 18, but he turned 18 years old on November 14, 2025.

3.     The claims here include Damian's substantive due process rights under federal law and companion state law claims.

## JURISDICTION AND VENUE

4.     This Court has federal question jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343 and 1983.

5.     Pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367, it may entertain the state law claims as they are derived from a common nucleus of operative facts.

6.     Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b)(1)-(2). The Defendants all "reside" in the Southern Division of the Eastern District of Michigan and the occurrence here took place in Lenawee County.

## PARTIES

7.     At all relevant times, Plaintiff Damian Alvarado is a citizen of the United States residing in the City of Adrian, County of Lenawee, State of Michigan.

8. At all relevant times, Defendant Madison School District is school district organized and carrying out its functions in Lenawee County, State of Michigan, is a provider of public education under the laws of the State of Michigan, with such functions non-exhaustively including staffing, training, supervising and policy making regarding Madison High School's staff and coaches, specifically, but not limited to, the staff present at this junior-varsity football game on August 31, 2023.

9. On information and belief, at all relevant times, Defendant Matthew Garno was an Assistant Coach for the Madison High School Junior-Varsity Football Team, and at all material times, he was employed by Defendant Edustaff.

10. On information and belief, at all relevant times, Defendant Michael Weissend was the Head Football Coach for the Madison High School Junior Varsity Football Team, and at all material times, he was employed by Defendant Edustaff and/or Madison High School.

11. On information and belief, at all relevant times, Defendant Lori Robinette was an athletic trainer performing athletic training services at the above-referenced game on behalf of Defendant Madison School District.

**FACTUAL ALLEGATIONS**

12. At the time of these events, Damian Alvarado was enrolled as a student at Madison High School as a sophomore and was a player on the junior varsity ("JV") football team.

13. On August 31, 2023, the JV team had its opening game of the season and was being played at Madison High School.

14. Damian started on the offensive line for the JV football team, and as the team largely ran the football, this position required him to constantly hit other players and be hit by the same.

15. In the second half of the game, during a running play, Damian took a big hit to his head from an opposing player that caused him to fall to his knees and he was slow to stand up.

16. After this hit, Damian came out of the game and reported to the staff that he felt dizzy; Defendants Garno, Weissend and Robinette were made aware of his reported dizziness.

17. At this point, it is believed that Defendant Robinette "evaluated" Damian; this evaluation is believed to have contravened Michigan's concussion protocols set forth in M.C.L § 333.9156, given it was lackluster at best.

18. It is upon information and belief that Defendant Robinette chose to return to Damian to the field of play without any sort of written clearance or documentation; this decision was also made with Defendant Weissend.

19.     It is believed that Defendant Madison School District did not perform any sort of baseline concussion testing before the season began, meaning the evaluation that Defendant Robinette allegedly performed had no foundation for what Damian's normal condition was.

20.     Despite that Damian was reporting dizziness and other symptoms of a concussion, he was returned to the game and continued playing; a decision that is believed to have been made by all individual Defendants.

21.     As the hit that Damian took leading to his dizziness was a big hit and evident to all watching the game, that coupled with his dizziness reflected significant indicia of a head injury and amounted to a suspected concussion.

22.     When Damian returned to the game shortly after the alleged evaluation, there was no documented clearance to return and/or written clearance from Defendant Robinette authorizing his return.

23.     As the game progressed, Damian continued to experience concussion symptoms, to the extent that he could barely keep his hand on the ground when lining up on the offensive line for each play, objectively struggled to balance, and his play overall was worse than normal, all of which were, or should have been, evident to the individual Defendants.

24.     Either late in the third quarter or early in the fourth quarter, there was a break in play, and as the team huddled, Damian told Defendant Garno—who was

aware of Damian's initial report of dizziness and suspected concussion—that his arm was tingling and feeling numb, that he did not feel well and still felt dizzy, and that he did not want to continue to play.

25. Despite this report of worsening concussion symptoms, Defendant Garno told Damian to "get the hell" back in the game, continued to run the same running play that resulted in frequent hits between Damian and the other team's players, and he did not require Damian to come out of the game for his own safety.

26. It is upon information and belief that other players had noticed Damian's ongoing symptoms and difficulty playing.

27. Foreseeably, in an ensuing play, Damian took another large hit to the head that caused him to stay on the ground.

28. The game ended shortly after that, and Damian collapsed on the field and had to be carried off the field in tears from pain to his head.

29. Damian's parents kept him from school on Thursday August 31, 2023, given he had ongoing concussion symptoms, and on Friday, September 1, he was taken to the Emergency Room due to worsening brain symptoms.

30. At the Emergency Room, Damian was diagnosed with a 1.1 cm left frontoparietal subdural hematoma and a 3 mm anterior left parafalcine subdural hematoma; a brain bleed.

31.     The successive hits to Damian's adolescent brain resulted in this brain bleed and permanent damage to Damian's brain.

## COUNT I—NEGLIGENCE AND/OR GROSS NEGLIGENCE—VIOLATION OF MICHIGAN LAW—AS TO ALL INDIVIDUALS

32.     Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

33.     As it pertains to the individual Defendants, this Count is pled alternatively seeking negligence and/or gross negligence given it is believed all Defendants were employed by private entities and not employed by Defendant Madison School District.

34.     To the extent the individuals are deemed state actors for purposes of their negligent acts, Plaintiff has also pled gross negligence.

35.     Pursuant to Michigan common law and M.C.L § 333.9155 and M.C.L § 333.9156, the individual Defendants had a duty to immediately remove Damian Alvarado when it was suspected that he had sustained a concussion.

36.     Following his removal, the individual Defendants had a duty to prohibit Damian from returning to playing until he was evaluated by an appropriate health professional AND received written clearance from that health professional authorizing his return.

37.     At all times relevant hereto, Defendants Garno, Robinette and Weissend were aware, or should have been aware, of Plaintiff's concussion

symptoms, the risks that successive concussions pose to young athletes such as Damian, and the risks that Damian faced if he sustained another blow to the head if he continued to play.

38. At all times relevant hereto, Defendants Garno, Robinette and Weissend were aware that Plaintiff Damian Alvarado experienced concussion symptoms following a severe hit to the head and that his play following this notice deteriorated, further illustrating his ongoing concussion.

39. Defendant Garno, upon his subsequent notice during the huddle where Damian reported ongoing and worsening concussion symptoms, disregarded the imminent risk that Damian faced if he continued to play.

40. By telling Damian to essentially shut up and play in the face of obvious concussion symptoms, Defendant Garno acted recklessly and showed a lack of concern for whether Damian suffered another, worse concussion.

41. Defendant Garno intentionally disregarded Damian's safety and laws and standards intended to protect young student athletes such as Damian when he forced Damian back into the game.

42. Defendant Garno knew, or should have known, of the risks that Damian faced if he continued to play despite multiple reports of concussion symptoms and knowing that the offense would continue to run the same plays that would lead to Damian taking more hits.

8

43. Defendants failed to utilize measures intended to protect student athletes like Plaintiff and this constituted gross negligence to the protection, health, and safety of Plaintiff.

44. Defendant Robinette disregarded Damian's safety and protocols intended to protect players like Damian who suffer concussion symptoms during a game by having him return to the field of play without proper clearance and without performing a valid examination to assess his brain injury.

45. Defendant Weissend, as the head coach, was watching the entire game, saw Damian's initial hit and his obvious injury and saw his declining play and manifested post-concussion symptoms as Damian continued to play, yet permitted him to stay in the game while running the same running play that ensured successive hits to Damian's head.

46. Defendants' grossly negligent conduct in permitting Damian to continue to play in a capacity that foreseeably would result in exposure to additional hits to the head, displayed conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results to Plaintiff.

47. Additionally, to the extent that some training was provided to Defendants relative to the above-referenced concussion protocols specific to youth high school athletes, Defendants' failure to remove Damian from the game upon actual and/or constructive notice that he suffered a concussion and/or experienced

9

concussion symptoms following his initial hit displayed conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiff.

48.     The individual Defendants' grossly negligent conduct was the cause of the injuries to Plaintiff, including an acute subdural hemorrhage and other injuries that occurred as a result of the same.

49.     Plaintiff Damian Alvarado has suffered, and will continue to suffer, great non-economic damages including pain and suffering, mental anguish, fright and shock, denial of social pleasure and enjoyments, embarrassment, humiliation and/or mortification, due to the Defendants' grossly negligent actions.

WHEREFORE, Plaintiff demands a judgment in his favor in an amount in excess of seventy-five thousand ($75,000.00) dollars against Defendants together with costs, interest and attorney fees.

## COUNT II—RESPONDEAT SUPERIOR/VICARIOUS LIABILITY AS TO DEFENDANT EDUSTAFF

50.     Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

51.     At all times relevant, Defendant Garno and/or Defendant Weissend were employed by Defendant Edustaff, a private, for-profit entity, and were acting in their course and scope of employment with Edustaff as football coaches for the Madison High School JV Football team.

10

52.     Under Michigan law, Edustaff is vicariously liable for the negligence of its employees, acting within the scope of their employment.

53.     As Plaintiff's coaches during this game, Defendants Garno and Weissend had a special relationship with Plaintiff and owed him a duty to act with ordinary to ensure his safety, and this includes complying with M.C.L § 333.9156.

54.     Defendants breached these duties by allowing and/or forcing Plaintiff to return to the playing field despite multiple reports of concussion symptoms, and particularly, when Plaintiff reported worsening concussion symptoms during the huddle to Defendant Garno.

55.     Defendants breached these duties by not pulling Plaintiff out of the game and not allowing him to play until it was safe for him to do so.

56.     Defendant Edustaff, irrespective of whether Defendants Garno or Weissend are deemed state actors, is liable for these negligent acts of its employees as they occurred within the course and scope.

57.     As a direct and proximate result of the actions and omissions of Edustaff's employees, Matthew Garno and/or Michael Weissend, Plaintiff Damian Alvarado has suffered damages as stated herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Edustaff, in whatever amount he is determined to be entitled and including compensatory and exemplary damages, interest, attorney fees,

11

and all costs incurred in this action and any additional relief the Court deems appropriate.

### COUNT III – STATE-CREATED DANGER, 42 U.S.C. §§ 1983, 1988 AS TO DEFENDANTS GARNO AND ROBINETTE

58.     Plaintiff repeats each of the preceding Paragraphs' allegations as if they were fully set forth herein.

59.     Plaintiff Damian Alvarado, as a United States citizen and pursuant to the Fourteenth Amendment to the United States Constitution, had a clearly established right to be free from danger created and/or increased by Defendants Garno and Robinette.

60.     As stated above, this Count is pled alternative to the extent that Defendant Garno and/or Defendant Robinette are deemed state actors despite their employment with non-state actors.

61.     At all relevant times, to the extent they are deemed state actors, Defendants Garno and Robinette were acting under color of state law and by way of their actions and conduct created and/or increased a state-created danger by substantially increasing the risk of harm to Damian Alvarado in reckless disregard to his safety with regard to the risk that he would be exposed to private acts of violence.

62.     These actions and conduct of the individual Defendants were objectively unreasonable and performed knowingly and with deliberate indifference

12

to Damian's safety and bodily integrity thereby creating and/or increasing a danger and/or by substantially increasing the risk of harm to Damian Alvarado in reckless disregard to his safety with regard to the risk that he would be exposed to from successive hits to his head while continuing to play football in this JV game.

63.   These actions and conduct of the individual Defendants deprived Damian Alvarado of his clearly established rights, privileges, and immunities in violation of the Fourteenth Amendment of the United States Constitution.

64.   These actions and conduct of the individual Defendants, which created and/or increased the risk of harm from suffering additional blows to the head and a more severe brain injury than he already sustained, non-exhaustively include:

   a.   Deliberately and intentionally returning Damian to the game after his initial concussion report and ongoing concussion symptoms;

   b.   Deliberately and intentionally returning Damian to the game without obtaining written clearance;

   c.   As it pertains to Defendant Garno, deliberately telling Damian to "get the hell" back in the game during the huddle when Damian reported worsening concussion symptoms;

   d.   As it pertains to Defendant Garno, pressuring Damian to return to the game when it was evident that he was injured and suffering concussion symptoms;

   e.   As it pertains to Defendant Garno, using his position of authority to make Damian believe he had to keep playing through injury or risk his status on the team;

   f.   As it pertains to Defendant Garno, calling plays that continued to put Damian at risk of successive hits to the head despite Garno's knowledge he was injured and was experiencing concussion symptoms;

g. As it pertains to Defendant Garno, deliberately and intentionally concealing facts from the appropriate head coach and athletic training staff;

h. As it pertains to Defendant Garno, deliberately deciding against reporting Damian's worsening concussion symptoms when Garno learned of them during the huddle;

i. Demonstrating conduct so reckless that it demonstrates a substantial lack of concern for whether any injury would result to Damian from a successive hit to the head;

j. The failures and resulting failures of the actions set forth in the foregoing subparagraphs; and

k. Any and all other breaches that may become known throughout the course of this litigation.

65. Defendants' conduct in putting Damian back in the game despite evident concussion symptoms shocks the conscience given it was intentionally done, intentionally disregarded the risks that successive blows to the head pose to a youth football player, and it was a matter of time until Damian suffered another blow to the head and foreseeable worse head injury.

66. Damian's ongoing concussion symptoms following the initial head injury made him slower and more susceptible to a future hit to the head, and as this was known to Defendants, by forcing him back in the game, Defendants increased the risk and he would suffer a successive blow to the head and severe brain injury.

67. Given youth football concussions represents a major issue throughout the country, Defendants knew of the risks the already-concussed Damian Alvarado

14

faced by continuing to play having already suffered a concussion and experiencing and reporting concussion symptoms.

68.     The above described actions and conduct of the individual Defendants was the proximate cause of Damian's foreseeable and anticipated second blow to the head and injuries and damages.

69.     At all material times, Defendants restricted Plaintiff's ability to protect himself and ensured that Damian would be placed in a position where he would be forced to hit other players on the other team.

70.     Defendants and Plaintiff had a special relationship for purpose of Plaintiffs' due process rights.

71.     As a result of the above-referenced affirmative acts, Damian's injuries and damages non-exhaustively include:

   a.  Successive concussions;
   b.  Subdural hematoma and brain bleed;
   c.  Traumatic brain injury
   d.  Post TBI symptoms
   e.  Post-traumatic seizures
   f.  Right hippocampal volume loss
   g.  Fright, shock and terror;
   h.  Mental, psychological and emotional distress, anxiety and anguish;
   i.  Medical, hospital and therapy/counseling expenses;
   j.  Punitive damages;
   k.  Exemplary damages;
   l.  Any and all other available past and future compensatory damages;
   m. Attorneys' fees and costs, 42 U.S.C. § 1988;
   n.  Any other injuries and damages relating to the aforedescribed incident that is revealed in the course of discovery;

o. Any other damages allowed by law.

72. The individual Defendants are not entitled to governmental or qualified immunity for their aforementioned actions and conduct.

WHEREFORE, Plaintiff claims judgment against the individual Defendants in an amount to which they are found to be entitled, together with interest, costs, attorneys' fees, exemplary damages and punitive damages.

## COUNT IV - 42 U.S.C. § 1983 - SUPERVISORY LIABILITY DEFENDANT MICHAEL WEISSEND

73. Plaintiff repeats each of the preceding Paragraphs' allegations as if they were fully set forth herein.

74. At all relevant times, Defendant Weissend was the head JV football coach and directly supervised and oversaw the actions of Defendants Garno and Robinette during the game at issue and encouraged the specific incident of misconduct and/or directly participated in it.

75. At all relevant times, Defendant Weissend, as the head JV football coach, directly supervised and oversaw the actions of Defendants Garno and Robinette, had knowledge of Damian's initial concussion symptoms and reports, and encouraged the specific incident of misconduct and/or directly participated in it by discouraging and dismissing players participating in a concussion protocol and/or coming out of the game due to reports of injuries.

16

76.     By inadequately training and/or supervising his coaching and training staff, and having a custom or policy of indifference to the constitutional rights of the JV football players and risks that successive concussions pose to young athletes—a "shut up and play" mentality that has plagued youth sports for decades—Defendant Weissend encouraged and cultivated the conduct which then caused a violation of Damian's rights under the Fourteenth Amendments of the United States Constitution.

77.     By not ordering Damian out of the game following reports of his concussion symptoms after the initial blow to his head, Defendant Weissend authorized, approved, or knowingly acquiesced in the unconstitutional conduct of Defendants Garno and Robinette.

78.     Pursuant to the Fourteenth Amendment of the United States Constitution, at all relevant times, Plaintiff had a clearly established right to be free from dangers created by the Defendants.

79.     That actions and omissions by Defendants Garno and Robinette—to the extent they are deemed state actors—under the Fourteenth Amendment to the United States Constitution, as well as 42 U.S.C. §§ 1983 and 1988, were all performed under the color of state law and were objectively unreasonable and performed knowingly and with deliberate indifference to Plaintiffs and in reckless disregard to his safety.

80.     The foregoing non-exhaustively described actions and conduct of the individual government defendants was a proximate cause of Plaintiff's injuries as described above.

WHEREFORE, Plaintiff claim judgment against Defendant Weissend in an amount to which he is found to be entitled, together with interest, costs, attorneys' fees, exemplary damages and punitive damages.

### COUNT V – 42 U.S.C. §§ 1983 – *MONELL* LIABILITY
### DEFENDANT MADISON SCHOOL DISTRICT

81.     Plaintiff repeats each of the preceding Paragraphs' allegations as if they were fully set forth herein.

82.     At all relevant times, Defendant Madison School District failed to adequately train, discipline and supervise the individual Defendants, *i.e.*, Defendants Garno, Robinette and Weissend, promulgating and maintaining *de facto* unconstitutional customs, policies, or practices, rendering them liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978).

83.     At all relevant times, Defendant Madison School District knew or should have known that the policies, procedures, training, supervision and discipline of the individual Defendants were inadequate for the tasks that each of those individual Defendants was required to perform, specifically including the JV football team's concussion protocols.

18

84. Upon information and belief, none of the individual Defendants were adequately trained regarding youth sports concussion protocols, and/or if they were trained, there was a pattern or practice of ignoring the rules and policies applicable to removing a student athlete who shows signs of a concussion.

85. While it is believed that the individual Defendants were employed by non-state actors, to the extent they are deemed state actors, Defendant Madison School District's policies, procedures and training, or lack thereof, applied to the individual Defendants.

86. In the alternative, to the extent that the individual Defendants are not state actors and/or did not perpetuate these constitutional deprivations, Defendant Madison School District faces independent Monell liability because its policies, acts, and practices led to Plaintiff being deprived his Constitutional right to bodily integrity and to be free from an state-created danger. See *North v. Cuyahoga County*, 754 Fed. Appx. 380 (6th Cir. 2018); *Stewart v. Warren County Board of Commissioners,* 821 Fed. Appx. 564, n. 4 (6th Cir. 2020).

87. At all relevant times, Defendant Madison School District failed to establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that its actions did not create or increase the risk that successive concussions pose to youth football players such as Damian Alvarado.

88. At all relevant times, Defendant Madison School District failed to

19

establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that football staff do not take actions that create or increase the risk of harm to youth football players, such as Damian Alvarado.

89. The importance of pre-season testing and establishing a baseline for youth football players is well known throughout high school athletics given it establishes a pre-injury benchmark for cognitive function and symptom burden, and despite that, Defendant Madison School District failed to implement any sort of concussion baseline testing, which would have been critical to test Damian following his initial blow to the head and concussion symptoms.

90. Due to Defendant's failure to establish a cognitive baseline procedure before the season began, there was nothing to compare against when Defendant Robinette allegedly examined Plaintiff following his initial blow to the head and concussion symptoms.

91. Defendant's failure to establish any sort of baseline testing process during the pre-season led, at least in part, to Defendant Robinette's reckless decision to return Damian to the game despite his evident concussion symptoms.

92. At all relevant times, Defendant Madison School District was on notice or should have known of a history, custom, propensity, and pattern for the individual Defendants and other employees of Madison High School, to fail to properly identify a potential concussion during a football game and remove the player from the field

of play, and that these individual Defendants acted in such a way that created a risk of harm to football players and/or increased a risk of harm to football players, such as Damian Alvarado.

93.     Defendant Madison School District explicitly and implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the strong likelihood that constitutional violations, such as in the instant case, would occur, and pursued policies, practices, and customs that were a direct and proximate cause of the deprivations of Plaintiff's constitutional rights.

94.     At all relevant times, Defendant Madison School District knew that its policies, procedures, customs, propensity and patterns of handling in-game concussion reports from football players would deprive student athletes, such as Damian Alvarado, of his constitutional rights.

95.     At all relevant times, Defendant Madison School District knew that its policies, procedures, customs, propensity and patterns allowed coaches such as Defendant Garno to pressure youth football players to return to play despite reported, worsening concussion symptoms, such that these actions created a risk of harm and/or an increased risk of harm to youth football players before having written clearance to return to play.

96.     Upon information and belief, Defendant Madison School District maintained a policy that allowed and/or encouraged coaches and staff to return

players to the field of play during a football game despite repeated reports of concussion symptoms following a large hit to the head and despite the common knowledge that successive injuries to the brain can have a grave impact on youth football players.

97. By inadequately training and/or supervising their football coaches and staff and having a custom or policy of deliberate indifference to the constitutional rights of their players, Defendant Madison School District encouraged and cultivated the conduct which violated Damian Alvarado's rights under the Fourteenth Amendment of the United States Constitution.

98. The foregoing non-exhaustively described actions and conduct of Defendant Madison School District was a proximate cause of Damian Alvarado's injuries and damages.

99. As to Plaintiff Damian Alvarado, those injuries and damages non-exhaustively include the injuries/damages already set forth above.

100. Defendant Madison School District is not entitled to governmental or qualified immunity for its aforementioned actions and conduct as the policies, procedures, training (or lack thereof) played a role in constitutional deprivations described above.

WHEREFORE, Plaintiff claims judgment against Defendant Madison School District in an amount to which they are found to be entitled, together with interest, costs, attorneys' fees, and all other damages allowable under Federal law.

Respectfully submitted,

BY:   /s/ *MICHAEL W. LAURILA*
MICHAEL W. LAURILA (P86937)
CHRISTENSEN LAW
Attorney for Plaintiff
25925 Telegraph Rd., Suite 200
Southfield, MI  48033
(248) 213-4900 | (248) 213-4901 – Fax
mlaurila@davidchristensenlaw.com
tcalmese@davidchristensenlaw.com

Dated: July 7, 2026

23

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DAMIAN ALVARADO,

    Plaintiffs,                              Case No.

v.                                     Hon.

MADISON SCHOOL DISTRICT;
MATTHEW GARNO, an individual;
LORI ROBINETTE, an individual;
MICHAEL WEISSEND, an individual;
EDUSTAFF, LLC, a Michigan Limited
Liability Company;

    Defendants.
_____/

MICHAEL W. LAURILA (P86937)
CHRISTENSEN LAW
Attorneys for Plaintiff
25925 Telegraph Rd., Suite 200
Southfield, MI  48033
(248) 213-4900 | (248) 213-4901 – Fax
mlaurila@davidchristensenlaw.com
tcalmese@davidchristensenlaw.com
_____/

**JURY DEMAND**

    Plaintiff, Damian Alvarado, by and through his attorneys, Christensen Law,

hereby demands Trial by Jury in this matter on all issues so triable.

                              Respectfully submitted,

BY:   /s/ *MICHAEL W. LAURILA*
          MICHAEL W. LAURILA (P86937)
          CHRISTENSEN LAW
          Attorney for Plaintiff
          25925 Telegraph Rd., Suite 200
          Southfield, MI  48033
          (248) 213-4900 | (248) 213-4901 – Fax
          mlaurila@davidchristensenlaw.com
          tcalmese@davidchristensenlaw.com

Dated: July 7, 2026

25